Paul J. High and Fay High v. Commissioner. Paul J. High v. Commissioner.
High v. Commissioner
Docket Nos. 42910, 42911.
United States Tax Court
T.C. Memo 1956-18; 1956 Tax Ct. Memo LEXIS 278; 15 T.C.M. (CCH) 91; T.C.M. (RIA) 56018; January 23, 1956
*278 1. The net income of Paul J. High for the taxable years 1945 and 1946 and of Paul J. and Fay High for the years 1947 through 1949, determined. 2. Held: The returns filed for all of the years involved were false and fraudulent with intent to evade tax, and a part of the deficiency for each of the years 1945 through 1949 was due to fraud with intent to evade tax. Lawrence G. Ropes, Jr., Esq., and H. P. Forrest, Esq., 228 North East Second Street, Miami, Fla., for the petitioners. Hugh F. Culverhouse, Esq., and Hugh G. Isley, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax of petitioner in Docket No. 42911, and additions thereto for fraud, for years *279 and in amounts as follows: 50 Percent
Addition for
Year
Deficiency
Fraud
1945
$ 597.40
$ 298.70
1946
7,824.94
3,912.47
The respondent also determined deficiencies in income tax of petitioners in Docket No. 42910, and additions thereto for fraud, for years and in amounts as follows: 50 Percent
Addition for
Year
Deficiency
Fraud
1947
$1,015.32
$ 507.66
1948
2,554.14
1,277.07
1949
1,449.64
724.82
The questions presented for decision are: (1) Whether respondent correctly determined the net income of petitioners for each of the taxable years. (2) Whether any part of any deficiency is due to fraud with intent to evade tax. (3) Whether the statute of limitations bars assessment and collection of any deficiencies for the taxable years 1945, 1946, and 1947. Findings of Fact The stipulation of facts filed by the parties, with exhibits attached, is adopted and, by this reference, made a part hereof. Additional facts were adduced by oral testimony. The petitioner in Docket No. 42911 is Paul J. High, who resides in Kendall, Florida. Paul is also co-petitioner with his wife Fay in Docket No. 42910. Paul *280 filed individual returns for the years 1945 and 1946 and joint returns with Fay for the years 1947 through 1949, on a cash basis, with the then collector of internal revenue for the district of Florida. The net income reported by petitioners and the net income determined by the Commissioner for the years 1945 through 1949, inclusive, is as follows: Net Income
Net Income
Year
Reported
Determined
1945
$3,364.40
$ 5,650.00
1946
6,117.51
24,856.39
1947
3,272.46
7,562.34
1948
(8,129.72)
13,959.62
1949
(1,840.19)
9,249.12
Paul was born in White Springs, Florida, on March 10, 1900. He attended school through the sixth grade and then ran away from home to go to work at the age of 14 years. He married the first time in 1923. Two children, a boy and a girl, were born of this union in 1924 and 1925, respectively. The boy died in the Navy during World War II. This first marriage ended in 1930. In 1933, Paul was married the second time; this marriage also ended in divorce. Thereafter, in 1937, petitioner was married a third time to his present wife, Fay. Prior to 1929, Paul was variously employed. His first employment after running away from home was *281 with the Broward Southern Dredging Company as a night foreman on a drill barge on the St. Lucie Canal. From 1916 to 1917, he worked for the Broward Auto Sales of Fort Lauderdale, Florida. In 1917, Paul enlisted in the United States Army from which he was later honorably discharged as a corporal. Upon his return to civilian life, Paul first worked for Thorpe and Knight Auto Sales in Miami. He then worked for a short period in the Police Department of the City of Miami, from which he transferred to the Street Department. He then worked for the Duval Engineer Contracting Company until 1929, when, on December 15, 1929, he joined the Miami Beach Police Department. He was so employed as a policeman until June of 1954. Paul started as a patrolman and worked his way up to Lieutenant, which grade he held for the last 17 years of his service. Having a distrust for banks, petitioners did not maintain a bank account prior to 1946, in which year they opened an account with the Coconut Grove Exchange Bank when they had some mortgage payments for collection. The balance of this account as at December 31, 1946, 1947, 1948 and 1949, was as follows: Year
Amount
1946
$1,619.00
1947
61.00
1948
328.07
1949
851.06
*282 From the time of his employment in 1929 by the Miami Beach Police Department through the year 1949, Paul's gross salary and his net salary, after deductions for annuities, U.S. bonds, and taxes, were as follows: Year
Gross Salary
Net Salary
1929
$ 75.00
$ 75.00
1930
1,922.50
1,922.50
1931
2,035.00
2,035.00
1932
1,262.50
1,262.50
1933
1,548.00 *
1,548.02 *
1934
2,440.00
1,860.00
1935
1,905.00
1,905.00
1936
2,042.50
2,042.50
1937
2,492.50
2,492.50
1938
2,656.49
2,596.13
1939
2,771.49
2,686.42
1940
2,656.49
2,574.95
1941
2,779.16
2,693.83
1942
3,215.98
2,686.02
1943
2,579.47
2,024.64
1944
3,343.86
2,435.95
1945
4,009.97
2,853.08
1946
4,401.21
3,720.25
1947
4,489.88
3,771.47
1948
3,794.00
3,192.34
1949
5,075.00
4,285.74
Prior to her marriage to Paul, Fay was a professional dancer and, using the stage name of Delores Fay, toured Central and South America. She was always very frugal. In or about the years 1929, 1930 and 1931, she advanced various sums of money to her brother, Victor Gerstel, who, at *283 the time, was in college. On one occasion, in 1933, she gave Victor $1,500.00 which he had requested. At the time of their marriage in 1937, petitioners pooled the amount of all savings each had to form a fund with which they planned ultimately to build a home, such fund not to be comingled with other funds or used for any other purpose. Current expenses were paid out of Paul's current income. The so-called building fund was never considered by petitioners to represent cash on hand. This fund was kept hidden in or about the particular dwelling where petitioners happened to be living. When they left town for a vacation in 1944, the fund was sealed in an envelope and given to Victor for safe keeping in the safe at his place of business. Immediately following their marriage, petitioners lived in a rented apartment in Miami Beach for about one year. Then they bought a 10-acre tract in what was known as Ida M. Fischer Estates in South Miami, on which they built a small house, where they resided from 1938 to 1944. They had their own garden. Fay did a lot of canning. Paul had chickens, ducks, turkeys and garden things that he raised. They were given a cow and had their own milk and butter. *284 Paul frequently hunted and brought in wild turkeys, quail and deer. During this period, petitioners' living expenses were approximately $1,800 per year. Because of an ordinance passed requiring all employees of the City of Miami Beach to reside within that city, petitioners, in 1942, moved into rented quarters in Miami Beach for which they paid $50.00 a month. Petitioners' expenditures during this period for living expenses approximately $1,800.00. During 1943, petitioners lived on a 280-acre farm in Citra, Florida, where they again canned vegetables and had their own chickens, eggs, pigs and cows. In 1944, petitioners returned to Miami Beach, where they occupied a two-bedroom duplex for which they paid a $50.00 per month rental. Their cost of living during that year was approximately $2,000.00. In 1946, petitioners purchased and moved to what was known as the Mayhew property, where they resided for a short period until they moved to the location of their present residence. Here they resided in a house that the Army had used in the prison camp at Baker's Haulover and which Paul had purchased and fixed up while the house they now occupy was being built. Paul paid $350.00 for the *285 Army house, had it wired and installed plumbing, thus bringing the cost thereof to approximately $500.00. He sold it for $1,200.00 and it was removed from the property. The profit so realized was not reported in Paul's return for 1946. Petitioners' cost of living was approximately $2,000.00 for each of the years 1947 through 1949. During the several years subsequent to his marriage to Fay, petitioner supported his son and frequently sent money to his daughter, both of whom were by his first marriage. The parties stipulated that during the years prior to 1949, Fay and/or Paul were parties to various real estate transactions. On September 22, 1936, Paul was grantee of George C. Pike of property described as the N. one-half of Lots 2 and 3, Block 17, Little River Gardens, at a cost of $2,000.00. On February 15, 1938, the same property was apparently redeeded by the same grantor to Paul and Fay. Thereafter, upon petitioners' failure to make payments on the mortgage thereon, a final decree of foreclosure was issued on March 30, 1940, in the case of George C. Pike v. Paul J. High, et al., on such property, which property was sold at public auction on April 17, 1940. The property referred *286 to above as the Fischer property was purchased by petitioners in May 1938 at a cost of $1,000.00, and sold by them to William E. Leach in December 1942 for the amount of $3,500.00. In September 1942, petitioners made two purchases of real estate from Harvey and Aulda Gee Studebaker. The first such purchase was of property in a subdivision known as Modern Mannor at a cost of $800.00, which property was sold in February 1945 for $800.00. The second purchase included several other tracts in Modern Mannor, the total cost of which was $200.00. On or about March 1, 1943, petitioners purchased the Hoffman property in Marion County, Florida, at a cost of $1,700.00. This property was sold in or about March 1944 to E. M. Leinecker for $3,500.00. Beginning about this time and continuing through the years involved, petitioners made several purchases of real estate with the idea of improving same and selling them at a profit. On March 17, 1944, petitioners bought 41 acres, more or less, lying south of Snapper Creek, from J. E. Groover and wife for the sum of $2,750.00, which property they sold to Habib Shaban on or about April 23, 1946, for approximately $6,800.00. Petitioners purchased the *287 Hutner property, consisting of 30 acres, more or less, on March 28, 1944, for the sum of $4,575.85. Subsequent to its acquisition, petitioners made improvements thereto having an approximate aggregate cost of $7,000.00, which amount included the cost of a prefabricated house. On February 25, 1946, petitioners sold the property for $12,000.00. Paul did not report the transaction or any gain therefrom, in his 1946 return. In 1945, petitioners borrowed $3,000.00 from Victor and $6,000.00 from Sam Cotton to improve some of the property acquired by them and to pay off a mortgage thereon preparatory to selling it. Petitioners acquired the Mayhew property on April 30, 1946, for $7,600.00. Subsequent to such acquisition, petitioners expended approximately $2,098.94 for improvements, surveying and clearing title. They entered into a contract for the sale of such property for $12,000.00 on June 20, 1946. This agreement had a rider attached thereto which provided as follows: "It is further understood that separate warranty deeds of conveyance are to be executed by the sellers to the purchasers, one for the Northwest corner of above described tract size 140feet on S. Ludlum Road, by 200feet *288 in square depth, in accordance to actual survey description secured by purchaser and one for the entire remainder of the above described tract. Purchaser reserves the right and privilege to secure, if possible, a more advantageous mortgage than the purchase money mortgage above set forth, in which case the sellers agree to accept the entire purchase price in cash." The transaction was handled through the Florida Title Company (hereinafter referred to as the title company) as escrow agent. Pursuant to the foregoing rider, two deeds were executed on July 31, 1946, and closing of the transaction was had on or about August 1, 1946. One of the deeds covering part of the property was recorded on August 8, 1946, and the other deed for the remainder of the property was recorded on November 6, 1946. Payments were made by the title company by checks dated August 14, 1946, November 1, 1946, and November 27, 1946, in the amounts of $2,367.81, $2,950.00 and $32.25, respectively. In reporting the transaction on his return for 1946, Paul predated the time of acquisition of the Mayhew property to January 30, 1946, and treated the gain realized on the foregoing sale as long-term capital gain. *289 By deed dated September 12, 1946, and recorded on September 19, 1946, petitioners purchased the Cotton property, which is, apparently, the site of their present residence, for $3,051.54. The cost of the house subsequently erected thereon and its furnishings brought the total cost of such property to $21,722.71. On April 28, 1948, petitioners purchased certain real estate, the deed to which was recorded on May 14, 1948, for the amount of $2,000.00. This property was sold by them on or about May 17, 1948, for $2,500.00. Neither the transaction nor any gain therefrom was reported on petitioners' return for 1948. Petitioners kept no books and records of any of their real estate transactions. In the returns filed by Paul for the years 1945 and 1946 and by Paul and Fay for the years 1947 through 1949, the following deductions for contributions were claimed: Year
Amount
1945
$100.00
1946
350.00
1947
450.00
1948
504.00
1949
125.00
Paul, in his returns for 1945 and 1946, and Paul and Fay, in their returns for 1947 through 1949, claimed aggregate medical and dental expenses as follows: Year
Amount
1945
$ 675.00
1946
675.00
1947
651.30
1948
1,002.00
1949
628.00
*290 Included in the amount claimed for 1945 was the sum of $175.00 purportedly paid to a "Dr. Sanborn, D.D.S." Paul paid Dr. Sanborn $150.00 in 1944 in full payment for dental services rendered to Fay in that year. Dr. Sanborn did not treat petitioners in 1945 nor did they make any payment to him in 1945. Petitioners also paid James J. Nugent, M.D., a total of $10.00 in 1945 for services rendered Fay, which amount was apparently including within the $500.00 claimed as having been paid to "Drs. Chambers, Negent [Nugent], Perry, Vaisberg * * * Jackson Memorial Hospital * * *." In his 1946 return, Paul claimed payment to a "Dr. Jones (Dentist)" of $350.00. During that year payments were made to Dr. Harry N. Jones D.D.S., in the total amount of $24.00 for services rendered to Fay. Dr. Jones billed Fay in 1947 for an additional $3.00, but was never paid. Petitioners claimed the payment of $30.00 to Dr. Jones as a dental expense in their 1947 return. During each of the years 1946 through 1949, dental services were rendered Fay by a Dr. J. F. McDonald. The amounts actually paid to Dr. McDonald for such services and the amounts claimed on the returns for those years are as follows: Actually
Claimed on
Year
Paid
Return
1946
$ 30.00
None
1947
2.00
$ 20.00
1948
298.00
350.00
1949
28.00
None
*291 In 1947 and 1948, Dr. Herbert Eichert rendered medical services to Fay. The amounts paid for such services and those claimed by petitioners in their 1947 and 1948 returns are as follows: Actually
Claimed on
Year
Paid
Return
1947
$25.00
$35.00
1948
10.00
75.00
In the years 1945, 1947 and 1949, treatments were given Fay by a Dr. Lewis M. Saunders, for which treatments he charged and was paid $25.00, $15.00 and $19.00, respectively. The payments so made to Dr. Saunders in 1945 and 1947 were not claimed on the returns for those years. In February 1948, treatments were rendered Fay by Dr. John R. Richardson, for which he charged and was paid $30.00. For additional treatments given Fay in March 1948, Dr. Richardson was paid $10.00 on March 31, 1948. Dr. Richardson was paid $10.00 in 1949 for services rendered Fay in that year. In their returns for 1947 and 1949, petitioners claimed payments to Dr. Richardson in the amounts of $30.00 and $5.00, respectively. They also claimed in their 1948 return a payment of $75.00 to a "Dr. Richards." As part of the amount claimed for medical and dental expenses in their 1948 and 1949 returns, petitioners claimed *292 the payment in 1948 of $125.00 to Drs. Bild and Knowles and the payment in 1949 of $125.00 to a "Dr. Magee" and of $10.00 to Dr. Yarborough. All of these doctors were veterinarians and were known as such to petitioners at the time the respective returns were filed. Upon being asked by her, Dr. McGee informed Fay in 1949 that veterinarians' bills were deductible only if dogs, or other animals, are raised for sale. Dental services were rendered Fay in 1948 and 1949 by Dr. J. H. Klock, for which services she was charged and paid $75.00 and $40.00, respectively. In their 1948 return, petitioners claimed the payment of $200.00 to a "Dr. Clark," who was a dentist. The payment of $40.00 to Dr. Klock is claimed on their 1949 return. Dr. Allen R. Bowers rendered dental services to Fay in 1949, for which he charged and was paid $33.00. The petitioners claim payments to Dr. Bowers in their returns for 1948 and 1949 in the amounts of $25.00 and $38.00, respectively. During 1947 and 1948, Fay was a patient of Dr. Donald E. Fortner, for which services she paid $50.00 and $4.00, respectively. The amount of $4.00 was not claimed on petitioners' return for 1948. As a result of hurricanes in 1947 *293 and 1948 and of high water in 1949, petitioners sustained damage to their property in Kendall. Not only the residence, but also a nursery maintained by petitioners was damaged. Prior to her marriage to Paul, Fay had been married to Antonio Prieto. Prieto died on October 13, 1936. Funeral arrangements for him were handled by the Combs Funeral Service, Inc., of Miami. A total of $175.38 was charged for such service, of which $152.72 was paid. At that time, Combs' minimum service charge was ordinarily $200.00, but when circumstances warranted charges were adjusted to fit the financial condition of the family. During the years 1942 through 1945, petitioners purchased and redeemed U.S. Series "E" bonds on dates and at places as follows: Maturity Value
Date Purchased
Date Redeemed
Place Redeemed
$ 25.00
September 1943
November 3, 1943
Ocala, Florida
50.00
August 1943
November 3, 1943
Ocala, Florida
25.00
June 1943
November 16, 1943
Citra, Florida
25.00
July 1943
November 16, 1943
Citra, Florida
50.00
July 1943
November 16, 1943
Citra, Florida
50.00
March 1943
November 19, 1943
Citra, Florida
50.00
April 1943
November 19, 1943
Citra, Florida
50.00
February 1943
December 20, 1943
Citra, Florida
50.00
February 1942
December 20, 1943
Citra, Florida
25.00
February 1942
March 9, 1944
Miami, Florida
25.00
April 1942
March 9, 1944
Miami, Florida
25.00
April 1942
March 9, 1944
Miami, Florida
25.00
March 1942
March 9, 1944
Miami, Florida
25.00
March 1942
March 9, 1944
Miami, Florida
25.00
May 1942
March 9, 1944
Miami, Florida
25.00
May 1942
March 9, 1944
Miami, Florida
25.00
June 1942
March 9, 1944
Miami, Florida
25.00
June 1942
March 9, 1944
Miami, Florida
25.00
July 1942
March 9, 1944
Miami, Florida
25.00
July 1942
March 9, 1944
Miami, Florida
25.00
August 1942
March 9, 1944
Miami, Florida
25.00
August 1942
March 9, 1944
Miami, Florida
25.00
September 1942
March 9, 1944
Miami, Florida
25.00
September 1942
March 9, 1944
Miami, Florida
25.00
October 1942
March 9, 1944
Miami, Florida
25.00
October 1942
March 9, 1944
Miami, Florida
25.00
November 1942
March 9, 1944
Miami, Florida
25.00
November 1942
March 9, 1944
Miami, Florida
25.00
December 1942
March 9, 1944
Miami, Florida
25.00
December 1942
March 9, 1944
Miami, Florida
$ 25.00
January 1943
March 9, 1944
Miami, Florida
25.00
January 1943
March 9, 1944
Miami, Florida
25.00
August 1944
December 10, 1945
Miami Beach, Florida
50.00
September 1944
December 10, 1945
Miami Beach, Florida
50.00
May 1944
December 10, 1945
Miami Beach, Florida
50.00
August 1944
December 10, 1945
Miami Beach, Florida
50.00
December 1944
December 10, 1945
Miami Beach, Florida
50.00
November 1944
December 10, 1945
Miami Beach, Florida
50.00
October 1944
December 10, 1945
Miami Beach, Florida
50.00
January 1945
December 10, 1945
Miami Beach, Florida
50.00
September 1945
December 10, 1945
Miami Beach, Florida
50.00
August 1945
December 10, 1945
Miami Beach, Florida
50.00
February 1945
December 10, 1945
Miami Beach, Florida
50.00
March 1945
December 10, 1945
Miami Beach, Florida
50.00
April 1945
December 10, 1945
Miami Beach, Florida
50.00
May 1945
December 10, 1945
Miami Beach, Florida
50.00
October 1945
December 10, 1945
Miami Beach, Florida
50.00
July 1945
December 10, 1945
Miami Beach, Florida
50.00
June 1945
December 10, 1945
Miami Beach, Florida
100.00
July 1944
December 10, 1945
Miami Beach, Florida
100.00
June 1944
December 10, 1945
Miami Beach, Florida
50.00
November 1945
January 7, 1946
Miami Beach, Florida
*294 Petitioners realized interest income in 1945 on the foregoing bonds redeemed in that year, which income they did not report. Also in that year, they derived income from the sale of dogs, which income they failed to report. Petitioners failed to report the gain realized by them in 1948 from the sale, for $450.00, of mules and a mowing machine which had cost them $125.00. During the years 1947 and 1948, petitioners received income which they failed to report in the amounts of $400.00 and $1,000.00, respectively, from the rental of a "CBS house" at the rear of their present residence. On the depreciation schedule in their return for 1949, petitioners listed such house as having been acquired on January 1, 1949, with no depreciation having been allowed or allowable. In their tax returns for the year 1948, petitioners claim a deduction for intangible property tax paid in the amount of $28.30. For the years 1940 through 1949, petitioners either filed no intangible property tax returns with the State of Florida or filed returns reflecting less than $5,000.00 cash on hand. Pursuant to Florida statutes, the tax on a $5,000.00 bank account would be $0.25. No intangible property tax is *295 shown on the tax rolls of Dade County, Florida, as having been assessed or paid by petitioners during the years 1940 through 1949. In a conference on January 10, 1952, with agents of respondent, during the investigatory stages of these proceedings, petitioners, when asked, estimated their cash on hand at December 31, 1944, to have been less than $500.00 or approximately $300.00. They stated that they did not maintain substantial sums of cash on hand in their home or in safe deposit boxes. No mention was made of any cash hoard. Most of the questions from which the foregoing information was adduced were answered by or discussed off the record with Fay and then acquiesced in by Paul, who was the only person placed under oath. No questions as to cash on hand were asked relative to the years after 1945, nor was the conference used to determine any item on any net worth statements. Most of the conference was held off the record. The transcript of the conference was never signed by Paul or Fay. Respondent determined the net income of petitioners for the years involved by means of the so-called net worth method, as follows: 12/31/44
12/31/45
12/31/46
12/31/47
12/31/48
12/31/49
ASSETS
Cash on Hand
$ 300.00
$ 300.00
$ 300.00
$ 300.00
$ 300.00
$ 300.00
Cash in Bank
1,619.00
61.00
328.07
851.06
Gillette Mtg. Rec.
450.00
Hilliard Mtg. Rec
5,879.09
5,501.56
5,100.77
4,675.24
Brown Mtg. Rec.
9,853.34
9,536.94
U.S. Savings Bonds
393.75
37.50
Jewelry
150.00
150.00
150.00
150.00
150.00
150.00
Automobiles
900.00
900.00
2,205.59
3,163.09
3,903.09
4,081.75
Studebaker Realty
800.00
Groover Realty
2,750.00
2,750.00
Hutner Realty
4,575.85
4,575.85
Cotton Land
3,051.45
3,051.45
3,051.45
3,051.45
Bldg. and Improvmts.
18,671.26
18,671.26
18,671.26
18,671.26
Bldg. and Improvmts.
5,040.37
5,040.37
5,040.37
Fill for Land
6,000.00
Animals
225.00
225.00
225.00
225.00
TOTAL ASSETS
$9,869.60
$9,163.35
$32,101.39
$36,163.73
$46,623.35
$52,583.07
LIABILITIES
Mortgage Payable - Hutner
$2,500.00
TOTAL LIABILITIES
$2,500.00
Net Worth - End of Year
$7,369.60
$9,163.35
$32,101.39
$36,163.73
$46,623.35
$52,583.07
Net Worth - Beg. of Year
7,369.60
9,163.35
32,101.39
36,163.73
46,623.35
Increase in Net Worth
$1,793.75
$22,938.04
$ 4,062.34
$10,459.62
$ 5,959.72
Add: Est. Living Expenses
4,000.00
4,000.00
4,000.00
4,500.00
4,500.00
Adt. Gross Income as Corrected
$5,793.75
$26,938.04
$ 8,062.34
$14,959.62
$10,459.72
Less: Standard Deduction
500.00
500.00
500.00
1,000.00
1,000.00
Total
$5,293.75
$26,438.04
$ 7,562.34
$13,959.62
$ 9,459.72
Less: Capital Gain Not Recognized
1,695.00
Corrected Net Income
$5,293.75
$24,743.04
$ 7,562.34
$13,959.62
$ 9,459.72
*296 The returns filed by Paul for the taxable years 1945 and 1946 and those filed by Paul and Fay for the years 1947 through 1949 were false and fraudulent with intent to evade tax, and a part of the deficiency in each of the years involved was due to fraud with intent to evade tax. Opinion VAN FOSSAN, Judge: At the outset, petitioners challenge the propriety of the respondent's net worth method in determining their taxable income for the years involved. However, they advance no valid argument in support of their contention that such use was unjustified and, as we view the instant record, there is none. Petitioners failed to keep any books reflecting their various real estate transactions, which transactions were admittedly entered into for profit, or any other adequate records from which respondent could determine their income. See Holland v. United States, 348 U.S. 121, rehearing denied, U.S. , January 31, 1955; Dupree v. United States, 218 Fed. (2d) 781, rehearing denied, 220 Fed. (2d) 748. Respondent's action is sustained. The next question is whether respondent's computations as set out above correctly reflect the taxable net income *297 of petitioners for each of the years involved. The parties have stipulated that only three items in such computations are here in controversy. Those are the amount of cash on hand at December 31 in each of the years 1944 through 1949, respectively, the amount of total liabilities as at December 31 in each of the taxable years, and the amount of estimated living expenses for each year. With respect to the first item, respondent's use of $300.00 as cash on hand is based upon an estimate given him by the taxpayers themselves of the amount of cash on hand at December 31, 1944. No reason appears for the use of such amount as cash on hand at the close of the succeeding years. Petitioners charge that the consistent use of such amount is arbitrary and contrary to the facts. They maintain, moreover, that at the time they gave their estimate of cash on hand, they did not understand the term to include the amount of their building fund which they never considered as cash. Wherefore, they contend for a much larger amount at December 31, 1944, which amount is given as $18,817.74 in the aforementioned stipulation and on brief as $19,030.24. In arriving at the latter figure and in support thereof, *298 petitioners set out in their brief a so-called analysis of all items of income and expenditures for each of the years since their marriage in 1937. We have made our own analysis of petitioners' income and disbursements in prior years as well as in those here involved as shown on this record, weighing probabilities against improbabilities, making allowances where such are deemed justified and such approximations as are, in our considered judgment, warranted. We have thereupon concluded that petitioners had cash on hand as at December 31, 1944, through 1947 in the amounts of $7,720.24, $17,520.24, $2,510.20 and $325.68, respectively. Cf. Cohan v. Commissioner, 39 Fed. (2d) 540. The foregoing amounts will be used in the Rule 50 computation consequent hereon. As for the remainder of the years in dispute, the evidence fails to establish a greater amount of cash on hand as of December 31 in each of them than respondent has allowed. Therefore, as to these items, respondent is sustained. The next point in dispute in respondent's net worth statement is his refusal to allow as liabilities in each of the taxable years the amount of $9,000 representing the aggregate of loans *299 payable to Sam Cotton and Victor. This issue is entirely one of fact, of which our findings above are dispositive. No extended discussion thereof is here deemed necessary. Suffice it to say that our findings as to the actual existence of such loans receivable are based upon the uncontradicted sworn testimony of Paul corroborated by that of Victor. We therefore hold that petitioner is sustained as to this item of loans payable. The next item in controversy is the estimated amount of petitioners' living expenses during each of the taxable years. Respondent's determination of $4,000.00 for each of the years 1945 through 1947 and of $4,500.00 for 1948 and 1949, is again based upon estimates said to have been given by petitioners to respondent's agents during the investigatory phases of the case. But, petitioners now insist that such expenses did not exceed $2,000.00 per year. Since the amounts advocated by both parties are based upon the sworn testimony of Paul, we have looked to all the other evidence bearing upon the standard of living maintained by petitioners and any other pertinent factor to ascertain what, in the light thereof, is the more realistic amount. We have so studied the *300 record made and our findings resultant thereon have resolved the question posed in favor of petitioners. We, consequently, hold that respondent is in error as to this item. The next question is whether respondent has properly imposed the 50 percent addition to tax for fraud in each of the years involved, as provided in Section 293(b), Internal Revenue Code of 1939. [1]
Fraud is never to be presumed. Rather, the presence of an intent upon the part of the taxpayer at the time he filed his returns fraudulently to evade payment of the taxes legally due must be proven by clear and convincing evidence. A. W. Mellon, 36 B.T.A. 977; Charles E. Mitchell, 32 B.T.A. 1093, affd. sub nom. Helvering v. Mitchell, 303 U.S. 391. The burden of producing the required quantum of proof is, by statute, placed upon respondent. See Section 1112, Internal Revenue Code *301 of 1939. Our findings above to the effect that the returns here involved were false and fraudulent and that a part of the deficiency for each of the years under review was due to fraud with intent to evade tax are dispositive of this question. Such findings reflect our conviction that respondent has sustained his burden and proven clearly and convincingly the presence of the requisite intent on the part of petitioners to evade taxes at the time the returns for each year were filed. Little more need be said. When all of the facts found on this record - the many instances of failure to report items of income received, the claiming of false medical and other deductions, the obvious inflation of deductions, the pre-dating of the acquisition date of property so as to bring it within the long-term capital gains provisions, to mention but a few - be considered as a whole, together with all the inferences properly to be drawn therefrom, the conclusion is inescapable that fraud within the statutory meaning was committed in each year. These facts carry the case beyond the realm of mere carelessness. We hold that petitioners' tax returns were conceived in fraud and fully sustain respondent's *302 determination that part of the deficiency for each year was due to fraud with intent to evade petitioners' just tax. Our finding as to fraud effectively answers in the negative and resolves in respondent's favor all questions as to the applicability of the statute of limitations. See Section 276(a), Internal Revenue Code of 1939. Decisions will be entered under Rule 50. Footnotes
*. These amounts were both stipulated. The obvious discrepancy remains unexplained in the record.↩
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 percentum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, * * *.↩